## IN MATTER OF DRAINAGE OF THE GREAT MEADOWS ON PEQUEST RIVER.

1. The act to provide for the drainage of lands, approved March 8th, 1871, (*Rev., p.* 662,) is constitutional, and the assessments made thereunder are to be apportioned, but not limited by special benefits, as under the law of eminent domain.

2. The objections to the amount of cost and assessments for improvements reported by the commissioners, must be supported by proof of facts, measurements, &c., and cannot be based on mere opinions and imperfect estimates made prior to the contract. It should appear, by direct and certain proof, that their determination is so clearly wrong as to manifest some bias, partiality, or fraud.

3. The statutory lien given by this act for assessments is not divested by the sale of the lands under the foreclosure of a prior mortgage.

4. Lands lying outside the geological survey and the boundaries given in the notice of application for the appointment of commissioners, cannot be assessed for benefits.

On exceptions to the assessments made by Amos Hoagland, James Boyd and William L. Johnson, commissioners appointed by the Supreme Court, filed by Aaron Van Buskirk, Isaac Cummens, the Crane Iron Company, Robert L. Kennedy, Charles S. Wurts, and others.

Argued at February Term, 1880, before Justices DEPUE, SCUDDER and KNAPP.

For the exceptants, *J. G. Shipman & Son* and *B. Gummere.*

For the commissioners, *T. Little.*

The opinion of the court was delivered by

SCUDDER, J.   The proceedings of the board of managers of the geological survey and of the commissioners appointed by this court in the matter of drainage of the great meadows on the Pequest river, have been before the court, and decisions had therein in 10 *Vroom* 197, 433, and 12 *Vroom* 175.

The commissioners having now made their final report of the completed assessment, under Section 2 of the act of 1871, (*Rev.*, *p.* 662,) objections have been filed by some of the land-owners who have been assessed for benefits.

These objections have been discussed elaborately and at great length, in apparent forgetfulness of the fact that some of the points taken have been already decided.

Thus it has been settled that the act to provide for the drainage of lands, approved March 8th, 1871, in its general scope and provisions, is constitutional, and that the assessments on lands are not necessarily limited to the amount of benefits actually received, under the law of eminent domain, but that the commissioners may distribute and assess the amount of the expenses in proportion, as near as they can judge, to the benefit derived from said drainage by the several parcels of lands to be assessed. In other words, that the assessments for drainage are to be apportioned, but not limited by actual benefits. This result has been reached on the ground that these proceedings are by usage and by the consent of the land-owners who are to be benefited and charged with the expenses, and no part thereof can be imposed on the public at large. *State, Britton, pros.*, v. *Blake*, 6 *Vroom* 208 ; *S. C.*, 7 *Vroom* 442.

The act of April 2d, 1868, (*Rev.*, *p.* 667,) limiting the charges to benefits received, relates to assessments made by commissioners appointed by any court, or by any justice or judge thereof, " by or under any general or special law of this state heretofore enacted." This subsequent act of 1871 is not, therefore, within the terms of the former act.

These preliminary points having been already determined, other questions of fact remain to be considered under these exceptions. As they are stated in different forms, and are numerous, it will be necessary to condense and group them, for convenience. Perhaps the most important general objection is to the cost of the work. The total amount of expenditures reported by the commissioners, is $107,916.07. This so far exceeds the previous estimates and statements of cost of

In matter of drainage on Pequest river.

the improvements made at different times, by those who were supposed to be competent to settle this question, that some of those who originally favored the work have since become hostile to it. The object was to reclaim nearly six thousand acres of low, marshy, boggy, and wet land, and to effect this, rock-reefs in the river were lowered, the bed of the river was leveled and widened, trees, stumps, bogs, brush, and temporary obstructions were removed, sand and mud-bars cleared away, and the five main tributaries to the Pequest river were cleared and opened for an aggregate distance of five and a quarter miles, in considerable portions of which the excavations averaged three and a half feet in depth. The commissioners report, also, that they have enlarged and partially rebuilt three of the public bridges over Pequest river, to make it of sufficient capacity to carry the stream. They also say that almost the whole work has been executed submerged, or in contact with water, with increased cost over ordinary excavations.

The work was in progress for five or six years, and required plans, maps, surveys, levelings, loans of money, and interest, to make payments, as the instalments became due.

The allegations that the expenditures are excessive, are supported only by general opinions, previous imperfect estimates, and, in one instance, an offer to build a bridge for $500, which cost more.

It is also objected that the charges of $5 per day, given by law to each commissioner for every day they were actually employed, and their expenses, are excessive.

But we are given no particulars of a proper expenditure, by exact and accurate measurements and calculations, made by competent engineers and experts, nor is there any explicit denial of the actual number of days' services rendered by the commissioners, or the moneys expended by them for surveys and other expenses incident to the work.

It is needless to say that no reduction of this assessment could be made on such evidence, nor would the court be warranted in saying that the expenses and charges are not accu-

rately stated.    Nor will it help in the determination of this objection that the expenses of the work are excessive; that several witnesses testify that, in their opinion, all the lands included in the survey are not worth the amount of the cost of the improvement.    The silence of the great majority of the persons whose lands are assessed, would seem to be an answer to this objection.    The amount of expenditure appears to be large, but the court can form no intelligent judgment as to how much is overcharged, without more definiteness in the proof, in opposition to the report of the commissioners.

The specific exceptions made by the objectors, that each of their lands is assessed beyond the benefits received, and that some are assessed where no benefit whatever appears, cover much of the evidence that has been taken.    There are some cases of hardship shown, where the owners of land are poor and their property is encumbered.    There is evidence to show that a large portion of the land formerly of Mrs. Mary V. Wurts, deceased, which has been assessed, is higher than other land included in the assessment, and that its value is not increased by the drainage; but there is contradictory evidence, showing that the exterior line of the survey was run where the wet land appeared, and that it was proper, in some cases, to assess lands lying above high-water mark, in the meadows, because that water will gather and collect on land above the stream into which it discharges, for ten or twelve feet elevation in a mile.    Professor George H. Cook, state geologist, in answer to the question, " Do you mean to say that land can be benefited by this drainage, that lies above the high-water mark of the Pequest, supposing that the whole tract lies on the Pequest?" says, " I do—the best agricultural drainage I have ever seen; the best farming land requires that the surface of the water should be kept eighteen inches below the surface, for a meadow, and fully three feet below the surface for the best growing of wheat."    Dr. J. Marshall Paul, who formerly owned these lands, made the attempt to dry them by ditches, without lowering the bed of the Pequest.    He succeeded only with a small portion of the

land, so that he could cultivate crops, and the ditches failing to clear themselves, and filling up, the lands became again almost useless. The whole evidence tends to show that if the ditches are cleared out, the lands will be benefited, and can be cultivated.

In the case of the lands of the Crane Iron Company, it is said that the property of others lies between these lands and the Pequest, so that they cannot be drained without ditching over the intervening land. There is evidence that an allowance has been made in the assessment for such additional expense, and Professor Cook states in his evidence that it may take several years for the lands farthest off the Pequest to show the full benefit of the drainage; that it will depend on how the owners make use of it by means of drains, and giving opportunities for the water to seek the Pequest; that the benefits will be hastened or retarded according to the management of the owners of the land.

With this character of evidence, so contradictory, the court would not be justified in setting aside any part of this assessment, upon the ground that the lands were not benefited, and could not be by the drainage; nor are the varying opinions of witnesses, on the amounts of the assessments in particular cases, sufficient to satisfy us that there have been over-estimates made by the commissioners. Amos Hoagland, the commissioner who appears to have given constant attention to the work through its whole progress, says that, after they had heard the objections made by the land-owners, the commissioners met together and carefully looked over the different tracts of land, and could see no cause why they should change the assessment of any of them, and that he has seen none since, after he had been present and heard the examination of witnesses on these exceptions.

This court has said that the rule to guide them in reviewing the acts of officers appointed to make public improvements and report thereon, is that their return cannot be set aside upon the testimony of others differing in judgment with them, unless it should appear that their determination was so

clearly wrong as to manifest some bias, partiality, or fraud on the part of the officers, or that it was procured by corruption or some undue means. If it were not so, a party objecting might appeal from the judgment of the officers appointed for the purpose, to the opinions and caprices of interested or irresponsible persons.

In *Stout* v. *Freeholders of Hopewell*, 1 *Dutcher* 202, and in *State, Hunt, pros.*, v. *Rahway*, 10 *Vroom* 646, Justice Dixon says: "Under the ninth section of the *certiorari* act of March 27th, 1874, it is our duty, in this class of cases, to determine disputed questions of fact, and affirm or reverse the assessment, in whole or in part, according to the justice of the case. Still, in determining such questions, the official certificates of the commissioners, under their oaths, and in the line of their duty, are entitled to much weight as evidence, and only clear proof of great force will justify us in concluding that they are erroneous."

These proceedings are not by *certiorari*, but on exceptions to the report; but, even applying this most liberal rule, it appears that the evidence in this case is short of the degree of certainty and strength to authorize interference with the reports of commissioners who have been upon the ground and examined the work, as the court has not done.

It is also objected that the work is not completed, but the commissioners and managers say that it is, and, in the language of some, it is a great success. I have seen no contradictory evidence, excepting that the witnesses for the objectors say that the stream has not been dredged all the way up to the extent of the Sussex line, but to this it is answered that it is not necessary, for the current is cutting the bed of the stream above where the dredging ceased. That it is said to be filling in some places, is explained by the crookedness of the stream, and it is testified that such filling is accidental, and will be cleared away by the current. It is also manifest that, with earth embankments, such washings will occur, and will make repairs necessary, but they do not show that the work has not been completed.

In matter of drainage on Pequest river.

The objection that some of the bonds issued by the commissioners to pay for the expense were given to the contractors in payment of an excessive price for the work, and were sold below their par value, is not sustained by evidence, and is answered by the contradictory testimony of the commissioners and of Abraham H. Day, who, acting as secretary, says that he received the subscriptions for the drainage bonds, and that after Judge Boyd was taken sick, he assisted in keeping his accounts as treasurer.

The exception made by Aaron Van Buskirk to the assessment on two tracts of land in and as part of lot No. 50, containing fourteen and forty-one hundredths acres, and lot 93, twenty-six and sixty-six hundredths acres, assessed to Selden T. Scranton, because said Scranton was not the owner when the assessment was made, having been sold under the foreclosure of a mortgage existing on these lands prior to the assessment, wherein the commissioners were made defendants, and set up no claim, and that the lands were sold, and bought by the objector, clear of said assessment, is not tenable in law. By Section 2 of the act of 1871, the assessment made upon each parcel of land, with lawful interest thereon, shall be a lien upon the said parcel of land, without regard to whom the owner or owners of said land may be. The commissioners were not bound to appear and defend the suit of foreclosure, and the objector bought with full notice and knowledge of the lien of the assessment. This statutory lien could only be divested by payment made by the owner of the land, whoever he might be, of the amount of the assessment. There is a manifestation of the legislative intention to make this lien paramount on the lands, in the third section of the act, which gives to the purchaser under sale for the assessment the right to the immediate possession of the land, and to take the rents, issues, and profits thereof, for the period or term of his purchase. *Howell* v. *Essex Road Board*, 5 *Stew.* 672.

The minor objections that have been made, not included

in the above statement, are not sustained by the proofs, and need not be mentioned.

It is doubtful whether some of the exceptions above considered might not have been more summarily disposed of, for the act says that the court "shall not reverse the assessment, or any part thereof, except for some error in law, or in the principles of assessment made or committed by said commissioners," but in a matter of such general interest, and affecting the security of the large amount of bonds that have been issued, we have thought it best to examine and decide each point of the objections made by the exceptants.

Special exceptions are made by James W. Tims, Phebe A. Wilson, Ephraim Simonton, and Aaron Van Buskirk, because certain lands assessed to them lie outside of the exterior line of the survey made by the board of managers of the geological survey.

All the lands assessed to Ephraim Simonton lie south of the beginning point of the managers' survey. This begins at the edge of the meadow, in front of the Presbyterian church at Danville, and thence bearing northwesterly, &c. Robert L. Garrison, the surveyor who made the original survey, says that the beginning point, as laid by him, is on the edge of the meadow in front of the Danville Presbyterian church, and that the great meadows end on the south at Larrison's bridge.

Professor Cook says that he considers near Larrison's bridge, within a hundred feet above, or more, the lower end of the great meadows.

Garrison testifies, also, that the lands assessed to Simonton; twenty-four and sixty-six hundredths acres assessed to Aaron Van Buskirk, and marked on the map as S. T. Scranton's; thirty-four and thirty-five hundredths acres assessed to John Lewis, and now owned by Phebe A. Wilson; and forty and ninety-six hundredths acres assessed to James W. Tims, all lie south of the exterior line of the geological survey. These lands were included, afterwards, in the commissioners'

survey, because they adjudged them to be benefited by the drainage.

In 10 *Vroom* 197, this court decided that only the lands described in the report of the managers of the geological survey, and in the notice of the application for the appointment of commissioners, are liable for the assessment.

The assessments as to these lands will be reversed, and it will be referred to the commissioners, to be corrected as to these assessments, pursuant to the statute. The other exceptions are overruled.